**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

IN THE MATTER OF:

Alan N. Gagleard, Nancy D. Gagleard,

Debtors.

Nancy D. Gagleard, et al.,

Appellants,

v.

United States of America,

Appellee.

No. CV-16-03736-PHX-JAT

BK NO. 2:14-bk-02552-BKM

ADV NO. 2:14-ap-00338-BKM

BAP NO. BAP No. AZ-16-1329

Prev. Court. No. 2:12-cv-709

Prev. Court. No. 2:15-cv-290

**ORDER**

Pending before the Court is the appeal of Alan Gagleard and Nancy Gagleard (the "Appellants") from the Bankruptcy Court for the District of Arizona (the "bankruptcy court"). The United States ("Appellee") has filed its response, (Doc. 12), to which Appellants have filed their Reply, (Doc. 13). Having considered the parties' filing, the Court now rules on the appeal.

## I. BACKGROUND

Bankruptcy Judge Martin found the facts as follows, annotated for brevity and relevancy to the issues on appeal:

> "Alan and Nancy Gagleard owned and operated various
> professional employer organizations (collectively "PEOs")

beginning in the early 1990s, including:

- Power PEO of Florida, Inc. ("PEO Florida") (formed in September 2001);
- Power PEO of Florida I, Inc. ("PEO Florida I") (formed in September 2001);
- Way To Go PEO, LLC ("Way to Go") (formed December 2003); and
- Texas Star Team, LLC ("Texas Star Team") (formed August 2004).

The Debtors were: the sole officers, directors and shareholders of PEO Florida and PEO Florida I; the sole officers, directors, and 75% shareholders of Way to Go; and the sole officers and 75% owners of Texas Star. In all the PEOs, Alan served as the company's president, treasurer, and general counsel; Nancy served as the vice president and secretary. Among other obligations of the PEOs, each was required to withhold federal income, FICA, and Medicare taxes from employees' salaries and pay over those withholding taxes to the IRS. There is no dispute that the Debtors were "responsible parties" for paying taxes under the Tax Code.

Under the authority of 26 U.S.C. § 6672, the IRS made the following assessments against the Debtors separately for their willful failure to collect, truthfully account for, and pay over the withheld income, FICA, and Medicare taxes for the PEOs:

| Assessment Date | Entity | Period | Amount |
| --- | --- | --- | --- |
| 6/4/2010 | Power PEO of Florida | 4th quarter 2002 | $113,637.60 |
| 6/4/2010 | Power PEO of Florida | 2nd quarter 2003 | $59,524.43 |
| 6/4/2010 | Power PEO of Florida | 3rd quarter 2003 | $15,594.73 |
| 6/4/2010 | Power PEO of Florida | 1st quarter 2004 | $58,965.94 |
| 6/4/2010 | Power PEO of Florida | 4th quarter 2004 | $122,132.02 |
| 6/4/2010 | Texas Star Team | 2d quarter 2005 | $12,310.90 |
| 6/4/2010 | Power PEO of Florida I | 3rd quarter 2005 | $81,682.91 |
| 6/4/2010 | Power PEO of Florida I | 4th quarter 2005 | $3,366.25 |
| 6/4/2010 | Power PEO of Florida I | 1st quarter 2006 | $486,594.45 |
| 6/4/2010 | Way To Go PEO | 4th quarter 2004 | $22,296.94 |
| 6/4/2010 | Way To Go PEO | 1st quarter 2005 | $55,002.16 |
| | | **Total** | **$1,030,908.33** |

Interest continues to compound daily on these amounts.

For each of the PEOs, the Debtors had authority to decide which bills the PEOs would pay. The Debtors used two bank accounts, one at Wachovia and one at Wells Fargo, for their PEOs. The Debtors opened the Wachovia accounts under PEO of Florida (account number ending in 8272) and the Wells Fargo account under Way to Go (account number ending in 4584). The Debtors used the Wachovia account for receivables, issuing paychecks, and making tax deposits for PEO Florida and PEO Florida I. They used the Way to Go Wells Fargo account as a general account for all their PEOs. From the Wells Fargo account, the Debtors paid the PEOs' operating expenses. The Debtors regularly intermingled funds between the Wachovia PEO Florida account and the Wells Fargo Way To Go account. To wit, from December 31, 2006, through September 1, 2007, $2,250,508 was transferred from the PEO Florida account at Wachovia to the Way to Go account at Wells Fargo, and $813,849.80 was transferred from the Way To Go account to the PEO Florida account. In roughly the same time period, the Debtors caused payments from the accounts as follows: almost $70,000 to landlord Double A Investments for rent (Ex. TT); almost $20,000 to Inter-Tel Leasing for telephone and data services (Ex. UU); and well over $600,000 to American Express for both business and personal credit card expenses. (Ex. VV-BBB).

Little about how the Debtors operated their businesses appears to have changed after April 15, 2007. Payments to key creditors remained consistent after April 15, 2017, in which time Way to Go issued· a significant number of checks to three creditors: over $50,000 to landlord Double A Investments for rent (Ex. TT); just over $10,000 to Inter-Tel Leasing for telephone and data services (Ex. UU); and almost $400,000 to American Express for both business and personal credit card expenses (Ex. VV-BBB). Significant cash was flowing in and out of the PEOs; from May 2007 to September 2007 there was roughly $2,000,000 in deposits into the Wachovia account and over $2,000,000 in withdrawals and checks. The transfers between the Wachovia and Wells Fargo accounts continued as well, with just over $1,300,000 transferred from Wachovia to Wells Fargo, and

just over $575,000 going from Wells Fargo to Wachovia (Ex. WW).

…

On December 15, 2006, Officer Jensen from the IRS (unexpectedly) paid the Debtors a visit to discuss the IRS' assessments for unpaid taxes for PEO Florida 4th quarter 2004; PEO Florida I 3rd quarter 2005; PEO Florida I 4th quarter 2005; PEO Florida I 1st quarter 2006; Way To Go 4th quarter 2004; and Way To Go 1st quarter 2005. The Debtors assert this was how they first became aware of the assessments.

The Debtors, however, claim that even though they were notified of the IRS' position, they had reason to believe it was in error, because 1) they had had miscommunications and misapplication issues in the past with the IRS and 2) their long-term, trusted controller, Sandra Atteberry, quickly assured them all was in order. Immediately after the meeting with Officer Jensen, according to Alan, he met with Ms. Atteberry who told him that the taxes had been paid. He then directed her to send the information to Mr. Dietrich who would deal directly with the IRS. Both Debtors testified that Ms. Atteberry provided the documents to the accountant, but they did not review the documents. . . . Though Alan admits that he became suspicious that the tax(es) weren't paid within a few weeks of the meeting with Officer Jensen, Alan and Nancy both testified that they didn't learn until April of 2007 that the reports (including bank statements) that Ms. Atteberry had provided Mr. Dietrich and which showed the tax payments, were fabricated.

Both Alan and Nancy testified that Ms. Atteberry pled guilty to embezzlement in March 2010. . . .

Nancy testified that they closed the PEOs in May 2006 (six months before Officer Jensen's visit), after finding out that the PEO's insurance carrier would not renew the PEOs workers' compensation coverage. The lack of insurance, the Debtors claim, caused them to enter into a marketing agreement ("Marketing Agreement"; Ex. 65) with AMS Staff Leasing ("AMS"). Nancy testified that the Debtors transferred the PEOs' books of business to AMS as part of the consideration for the Marketing Agreement. According to Nancy, AMS requested that the Debtors use the PEOs' software to process the payroll for the AMS

> client company employees, explaining why payroll payments were processed through the Way To Go LLC operating account at Wells Fargo."

Bankruptcy Court Under Advisement Order at 2–7 (hereinafter the "Order").

On April 3, 2012, Appellants brought an action in this Court requesting a refund of amounts they had paid toward the IRS's § 6672 assessments against them. Four months later, on August 3, 2012, the United States answered and counterclaimed for the outstanding balance on these assessments. After the parties had completed discovery, including a deposition of Appellant Alan Gagleard on November 12, 2013, the United States moved for summary judgment on February 14, 2014. On February 27, 2014, Appellants filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which stayed the action pursuant to 11 U.S.C. § 362(a). Given the stay, this Court denied Appellee's motion for summary judgment without prejudice on May 12, 2014.

On April 18, 2014, Appellants filed an adversary proceeding in the bankruptcy court under 11 U.S.C. § 505. The adversary complaint sought a determination of Appellants' liability for the § 6672 assessments as well as additional assessments related to Way To Go PEO. The parties completed another round of discovery, which included a second deposition of Alan Gagleard on March 17, 2015. The United States again moved for summary judgment on May 21, 2015. The bankruptcy court granted summary judgment for the United States on the issue of "responsible persons," ruling that under § 6672, Appellants were responsible for the trust fund payments at issue.

The parties agreed to schedule the trial for February 2016 in a stipulation filed on October 2, 2015. At what was supposed to be the final pretrial hearing on January 12, 2016, Appellants requested additional discovery before trial commenced. The bankruptcy court allowed Appellants to brief their request to reopen discovery, and placed a February 10, 2016 hearing on the calendar to discuss the issue and to set a new trial date.

Additionally, prior to the January 12, 2016 hearing Appellants had filed an affidavit to the bankruptcy court detailing Mr. Gagleard's medical conditions. In

response, at the January 12 hearing the bankruptcy court directed Appellants to make alternative arrangements for Mr. Gagleard to testify at trial if any health condition would prevent him from taking the stand. The bankruptcy court also offered that if Mr. Gagleard was unable to testify in person, the parties could submit testimony from one or both of his previous depositions or he could submit a declaration.

At the February 10, 2016 hearing, the Appellants informed the bankruptcy court that they would not be moving to reopen discovery. The parties and the bankruptcy court agreed on a trial date of May 11, 2016. However, a little over a month later, Appellants moved for a six-month continuance of the trial. Appellants claimed that the continuance was needed because Mr. Gagleard, due to his medical condition, was unable to testify in person. The Appellants, in support of their motion, submitted a letter from one of Mr. Gagleard's treating physicians, Dr. Joshua A. Tobin. (Letter from Dr. Joshua Tobin to the Honorable Brenda K. Martin (Mar. 23 2016)). The letter described Mr. Gagleard's condition as debilitating, and in it Dr. Tobin stated that "there is no possible way on earth [Mr. Gagleard] can take part in a deposition or trial in any meaningful way." *Id.* The United States opposed the motion, and on April 25, 2016, the bankruptcy court denied Appellants' motion for a continuance.

The trial began on May 11, 2016. Appellants brought their case primarily using Nancy Gagleard's testimony. Appellants did not call any other witnesses, including Alan Gagleard, and they did not submit Mr. Gagleard's deposition testimony or any other testimony by Mr. Gagleard. The United States did enter into the trial record excerpts from Mr. Gagleard's testimony from both of his depositions. At the conclusion of the trial, the bankruptcy court directed the parties to file post-trial briefs, at Appellants' request. The parties submitted their briefs on June 3, 2016. After review of the final briefs, on September 14, 2016 the bankruptcy court issued its decision. It ruled in favor of the United States, finding that Appellants had willfully failed to pay over the trust fund taxes related to all the § 6672 assessments at issue.

Particularly relevant to this appeal, the bankruptcy court made the following factual determinations. First, related to the § 6672 assessments based on Power PEO of Florida's liabilities for 2002 through 2004, and for Way To Go PEO's liability for 2004, the bankruptcy court found that Appellants produced no evidence to demonstrate that they were not liable. (Order at 9). Appellants claimed that the IRS misdirected payments made by Appellants intended for these PEOs to other PEOs owned by the Appellants. These misdirected payments caused the liabilities, Appellants argued. However, the bankruptcy court found no evidence that Appellants directed the IRS to apply the payments any differently than the IRS applied them. (*Id.*). The bankruptcy court also found that even if the IRS had applied the payments as Appellants claim they should have, that would have simply created liabilities for Appellants' other PEOs for different periods, and would not have changed the total liability they would have owed the IRS. (*Id.* at 9–10).

Second, related to the § 6672 assessments based on Power PEO of Florida I's liabilities for 2005 through 2006, and for Way To Go PEO's liability for 2005, the bankruptcy court found that Appellants produced no evidence to demonstrate that they were not liable. Appellants argue that in May of 2006, before they learned of the liabilities, they transferred their PEOs' clients to another company and ceased operating. By paying the PEOs' other creditors through 2007, then, they could not have been favoring them over the United States, as the PEOs no longer existed. The bankruptcy court, however, found no evidence that the PEOs had transferred their clients, and in fact determined that the PEOs continued to operate through at least 2007. (*Id.* at 10–11). Additionally, after the Appellants became aware of the PEOs' liabilities, they made over $450,000 in payments to creditors other than the United States. (*Id.* at 13). It is because of these facts that the bankruptcy court determined that the Appellants willfully failed to pay their liabilities to the IRS.

Appellants timely appealed to this Court and argue that the bankruptcy court (1) abused its discretion by not granting a six month continuance to allow Appellant Alan

Gagleard to testify; (2) erred in finding that no evidence existed to support Appellants' "misapplied payments" claim; and (3) erred in finding that after the Appellants became aware of their PEOs' tax liabilities, they continued to operate the PEOs and preferred other creditors over the United States.

## II.      JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this case pursuant to 29 U.S.C. § 158(a), which provides that "district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 29 U.S.C. § 158(a). The bankruptcy court's findings of fact are reviewed for clear error. *In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010). This Court is to accept the bankruptcy court's findings of fact, unless the Court is left with the definite and firm conviction that a mistake has been committed. *Id.* The bankruptcy court's conclusions of law are reviewed de novo. *Compton Impressions, Ltd. v. Queen City Bank, N.A.*, 217 F.3d 1256, 1260 (9th Cir. 2000). Finally, the decision to grant or deny a continuance lies within the court's sound discretion, and "will not be overturned except upon a showing of clear abuse." *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1102 (9th Cir. 1998).

## III.     ANALYSIS

The Appellants' claims of error on appeal are that the bankruptcy court: (1) abused its discretion by not granting Appellants' requested six month continuance; (2) erred in finding that no evidence existed to support Appellants' "misapplied payments" claim; and (3) erred in finding that after the Appellants became aware of their PEOs' tax liabilities, they continued to operate the PEOs and preferred other creditors over the United States. The Court will consider each claim in turn.

### A.      The Requested Continuance

Appellants argue that Mr. Gagleard's poor health prevented him from participating in trial, which denied Appellants a fair trial as Mr. Gagleard's insight and first-hand knowledge of the facts was "crucial" to their success. (Doc. 10 at 11). In particular,

Appellants state that Mr. Gagleard's history of intense migraines would render him unable to testify at trial. Appellants also claim that Mr. Gagleard was suffering from intense neck pain caused by a car accident, and that he had severe heart issues in the past as well. Ultimately, Appellants urge that "[b]eing robbed of [Mr. Gagleard's] testimony and assistance to counsel . . . [made it] very difficult for Appellants to prevail at trial." (*Id.* at 12). As such, Appellants argue that the bankruptcy court abused its discretion when it denied their Motion to Continue.

As stated above, the decision to grant or deny a continuance lies within the court's sound discretion, and "will not be overturned except upon a showing of clear abuse." *Citicorp Real Estate, Inc.*, 155 F.3d at 1102. To demonstrate that there has been such a clear abuse of discretion, Appellants have the burden of showing that the bankruptcy court, in denying their motion, acted arbitrarily or capriciously. *See Federal Trade Commission v. Gill*, 265 F.3d 944, 957 (9th Cir. 2001). To help guide its analysis, the Ninth Circuit Court of Appeals (the "Ninth Circuit") analyzes a lower court's decision to deny a continuance using four factors. *United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir. 1985). These factors are: 1) the extent of the Appellants' diligence in readying the defense; 2) the likelihood the continuance would have satisfied Appellants' need; 3) the inconvenience to the court, opposing party and witnesses; and 4) the extent to which the Appellants may have been harmed. *Id.* Finally, "[t]o demonstrate reversible error, [Appellants] must show that the denial resulted in actual prejudice to [their] defense." *United States v. Lane,* 765 F.2d 1376, 1379 (9th Cir.1985).

### 1.     Extent of Appellants' Diligence in Readying Its Defense

Appellants argue that this first factor weighs in their favor because they did not request the continuance to ready their defense; "[r]ather, the continuance was sought for only one reason: to allow Alan Gagleard's health to improve so he could testify." (Doc. 10 at 13). Appellee responds by questioning the underlying purpose of Appellants' requested continuance. (Doc. 12 at 10–11). Appellee argues that based on the medical affidavit provided by Mr. Gagleard, at the time the continuance was filed "Mr.

Gagleard's condition would not improve within six months." (*Id.* at 11). Appellee implies that this inconsistency points to an ulterior motive for the continuance outside of Mr. Gagleard's health, especially in light of Appellants' alleged "history of engaging in delay tactics." (*Id.*).

If the Appellants are to be taken at their word, the continuance was not filed due to a lack of readiness for trial on their part, but instead to allow Mr. Gagleard's health to improve so he could testify at trial. (Doc. 10 at 13). However, in analyzing this factor, the Court must consider the circumstances of the case and ultimately determine "whether [Appellants'] request for a continuance appears to be a delaying tactic." *United States v. Kloehn*, 620 F.3d 1122 (9th Cir. 2010) (citing *Flynt*, 756 F.2d at 1359). Viewing Appellants' request in this light, the circumstances do appear to lend credence to Appellee's argument that Appellants are trying to further delay the trial.

First, in the Appellants' initial law suit seeking a refund from the IRS, the parties completed discovery in late 2013. Less than two weeks after the IRS filed a motion for summary judgment on February 14, 2014, the Appellants filed for relief under Chapter 11 of the Bankruptcy Code, staying the action pursuant to 11 U.S.C. § 362(a), causing the denial of the IRS' motion for summary judgment and postponement of that trial. Second, in the instant matter, on January 12, 2016, on the eve of trial and almost a year after discovery ended, the Appellants requested that discovery be reopened. The Court allowed the issue to be briefed, setting a deadline of February 10, 2016. However, at the February 10 hearing, the Appellants withdrew their request to reopen discovery, and the parties agreed to a trial date in May 2016. This process delayed what was supposed to be a February trial until May. Then, about a month later in March 2016, the Appellants again changed course and requested the six month continuance at issue here, which was ultimately denied.

This checkered history of delay and avoidance, in addition to the fact that Mr. Gagleard's medical condition was a chronic one that unfortunately did not appear to be treatable within six months, lends support to the argument that the requested continuance

was for reasons outside of Mr. Gagleard's health and ability to testify live at trial. For these reasons, this first factor weighs in favor of affirming the continuance denial.

### 2. Likelihood the Continuance Would Have Satisfied Appellants' Need

Appellants argue that the continuance would have perfectly satisfied their need, as Mr. Gagleard is now healthy and able to testify at trial. (Doc. 10 at 13). Appellee disagrees, stating that because the majority of the conditions that Mr. Gagleard suffered from were chronic, "[i]t thus appeared when Appellants moved for a continuance that Mr. Gagleard's condition would not improve within six months." (Doc. 12 at 11).

The documents in the record support the conclusion that at the time Appellants moved for a continuance it was unlikely that Mr. Gagleard's health would significantly improve within six months. In Mr. Gagleard's January 11, 2016 affidavit, he states that his migraine headaches, which are particularly painful, have afflicted him since 2011. His cluster headaches began in March 2015. (Aff. of Alan Gagleard, at 3 (Jan. 11, 2016)). He has sought medical treatment from Dr. Bendheim, who "tried numerous medications with no positive results." (*Id.* at 2). Dr. Bendheim referred him to his partner, Dr. Tobin, who increased Mr. Gagleard's medications, "which to date have provided no relief from the migraines." (*Id.* at 3). Mr. Gagleard also sought treatment with a headache specialist in Phoenix. According to Mr. Gagleard, "[s]he prescribed numerous medications, none of which provided any relief from the migraine headaches." (*Id.*).

Finally, Dr. Tobin sent a letter in March 2016 to the bankruptcy court providing his opinion on Mr. Gagleard. (Letter from Dr. Joshua Tobin to the Honorable Brenda K. Martin (Mar. 23 2016)). Dr. Tobin wrote that Mr. Gagleard was suffering from headaches, migraines and cluster headaches. (*Id.*). He wrote that although Mr. Gagleard has been extensively evaluated, "headache medicine is largely trial and error, and we are trying different medications to control his pain." (*Id.*). Regardless, Dr. Tobin wrote that "[t]here is no possible way on earth he could take part in a deposition or trial in any meaningful way." (*Id.*).

If the Court believes Mr. Gagleard's and Dr. Tobin's statements, it does not appear that treatment and successful recovery was likely within six months. Mr. Gagleard had met with numerous physicians about his many medical issues, and none of them were able to meaningfully treat him. Additionally, he had been suffering from migraine headaches since 2011, and his cluster headaches for over a year. While some of his afflictions were more recent, such as his neck pain as a result of a car accident, the totality of the facts support the conclusion that it was unlikely that Mr. Gagleard would have meaningfully recovered from most of his conditions within six months of the continuance. As such, this second factor weighs in favor of affirming the continuance denial.

### 3. Inconvenience to the Court, Opposing Party and Witnesses

Appellants argue that the continuance would have caused no inconvenience to the bankruptcy court, and only minimal if any inconvenience to Appellee or Appellee's witnesses. (Doc. 10 at 13). Appellee does not directly respond to this point. The fact that this was not a jury trial and that the continuance was requested two months before the trial date both support Appellants' argument that there may not have been inconvenience to the bankruptcy court. Yet, the bankruptcy court's need to efficiently manage its docket would weigh in favor of finding an inconvenience to the bankruptcy court to again continue this trial. However, Appellee offers nothing in its brief to demonstrate inconvenience to itself or its witnesses, who are both employees of Appellee. Because of the foregoing, this third factor weighs slightly in Appellants' favor.

### 4. Damaging Effect of Denial on Appellants' Case

Appellants argue that due to Appellant Nancy Gagleard's memory problems and lack of first-hand knowledge, Mr. Gagleard was the key witness in the case. Appellants further argue that by not allowing the continuance, the bankruptcy court prevented Mr. Gagleard from testifying, as his health at the time would not permit him to do so. Appellee responds by pointing to the myriad of alternatives that the bankruptcy court provided to allow Mr. Gagleard's testimony to be admitted at trial. Appellee argues that

Appellants were not damaged by the denial, because they could have introduced Mr. Gagleard's testimony at trial in multiple ways.

Once the bankruptcy court became aware of Mr. Gagleard's health concerns in January 2016, it directed Appellants to make such alternative arrangements as were necessary so Mr. Gagleard could testify if he chose to do so. (Audio recording of bankruptcy court pretrial conference, minutes 8:25–10:18 (Jan. 12, 2016)). Some of the bankruptcy court's suggested solutions included bringing in a hospital bed for him, allowing him to take multiple breaks while he testified, or taking his testimony at another location, including the option to testify by video conference from his home. (*Id.*). If these means failed, the bankruptcy court stated that Appellants could enter Mr. Gagleard's deposition testimony into the record or submit his testimony through declaration. (*Id.*). Appellants were unsatisfied by these alternatives, however, because Mr. Gagleard was on multiple medications, and presenting deposition testimony or a declaration would prevent Appellants from providing a cohesive and logical "narrative flow." (Doc. 13 at 4). Appellants finally argue that if they had submitted Mr. Gagleard's testimony through declaration, it would injure Appellee's right to cross examine the witness, and as such, this option was "insufficient and unworkable."

The Court finds Appellants' arguments unpersuasive. At its January 12, 2016 status hearing, the bankruptcy court offered a number of workable solutions that would have allowed Appellants to submit Mr. Gagleard's testimony. While hearing live testimony is typically preferable and may in some circumstances merit a short continuance,[1] this situation is not one of them. While Appellants contend Mr. Gagleard was in no condition to give live testimony either in person or via video, they had the opportunity to submit his testimony through one or both of his depositions. If Appellants

---

[1] In *United States v. Meija*, the Ninth Circuit found that the trial court abused its discretion when it read the transcripts of two witnesses instead of continuing the trial a day to allow two key witnesses to present live testimony. 69 F.3d 309, 314 (9th Cir. 1995). The fact that the two key witnesses in *Meija* were certain to be available only one court day later distinguishes *Meija* from the instant case. *Id.* at 313–14. In the instant case, Appellants sought a six month continuance to allow for the uncertain (perhaps even unlikely) recovery of Mr. Gagleard.

were discontent with submitting portions of Mr. Gagleard's deposition testimony into the record, as the Appellee did, they could have submitted a declaration. Although Appellants argue that the submission of a declaration would deprive Appellee the ability to effectively cross examine Mr. Gagleard, this argument is unpersuasive. Appellee is the party with standing to raise that issue, and they chose not to raise it in their brief. The alternative solutions offered by the bankruptcy court to Mr. Gagleard's live testimony undercut the Appellants' arguments that they suffered harm as a result of the denial of the continuance. As such, this fourth and final factor weighs in favor of affirming the continuance denial.

Given that three out of four of the factors favor affirming the denial of the continuance, including the most critical factor, number four, this Court finds that the bankruptcy court did not abuse its discretion when it denied the Appellants' request for a six month continuance.

## B. The Misapplied Payments Claim

Appellants argue that Appellee did not count or incorrectly applied Appellants' tax payments for some of their entities between 2002 and 2004. Specifically, Appellants claim that payments for the 4th quarter of 2002, 2nd and 3rd quarter of 2003, and 1st quarter of 2004 for Power PEO of Florida were misapplied or discounted entirely. Appellants further contend that Mr. Gagleard could have testified to the specifics of these payments but for the denial of the continuance.

As stated above, the bankruptcy court's findings of fact are reviewed for clear error. *In re JTS Corp.*, 617 F.3d at 1109. This Court must accept the bankruptcy court's findings of fact, unless the Court is left with the definite and firm conviction that a mistake has been committed. *Id.*

### 1. Power PEO of Florida 4th Quarter 2002 Payment

Appellant first contends that Nancy Gagleard made the proper quarterly payment for the 4th quarter of 2002 on behalf of Power PEO of Florida. (Doc. 10 at 14–15). This payment was in the amount of $108,901.17. The controversy arises because it appears

that the $108,901.17 payment made on December 18, 2002 was applied to Power PEO Inc., then subsequently "reversed out" and applied to Power PEO of Florida. This alleged misapplication led to a mix-up, the Appellants contend, that ultimately may have caused the $108,901.17 payment to become lost and uncredited.

Appellee responds by noting that the Appellants' theory rests solely on Nancy Gagleard's testimony, who relied on outdated and incomplete IRS account transcripts. They argue that the payments were credited to one of Appellants' entities, and that even if they did not apply the payment to the entity of Appellants' choosing, the application of the credit was in their favor. On this point, Appellee refers to the testimony of IRS Revenue Officer/Advisor Mary Kessner. Officer Kessner "testified that if the IRS had applied all the payments as Appellants now claim they should have been applied, they would have created liabilities for Appellants' other entities or for other quarters. Those liabilities would have been equal to or greater than their current liabilities." (Doc. 12 at 14).

The bankruptcy court accurately noted that the IRS has some flexibility in how it allocates tax payments. (Order at 9, *citing Davis v. United States*, 961 F.2d 867, 879 (9th Cir. 1992) (noting that "[s]traitjacketing the IRS into its initial allocation decision would be inconsistent with the goal of maximizing tax revenues.")). While the IRS' decision to move the $108,901.17 payment into and out of different entities may have been frustrating for Appellants, it was not necessarily wrong. Additionally, IRS employee Mary Kessner testified that after looking at IRS account transcripts, the $108,901.17 payment *was* in fact deposited into Power PEO of Florida's account towards their liabilities on December 18, 2002, after the original transfer. On this record, the Court does not find that the bankruptcy court committed clear error. Accordingly, the decision regarding the application of this payment is affirmed.

### 2. Precluded Misapplication Testimony by Alan Gagleard

Appellants argue that in addition to the misapplied $108,901.17 payment there were a number of other payments that were misapplied by the IRS. They contend that the

2nd and 3rd quarter of 2002 payments as well as the 1st quarter of 2004 payment for Power PEO of Florida were also misapplied. Unfortunately, Appellants state that the testimony that would support the misapplication claims could have only come from Alan Gagleard, as Nancy Gagleard did not have first-hand knowledge of these payments. Echoing their earlier argument, Appellants recite that the case should be remanded to the bankruptcy court so that Mr. Gagleard will have the opportunity to testify as to these payments.

Appellee responds by noting that in his deposition testimony, Mr. Gagleard stated that Mrs. Gagleard ran their PEOs' payroll management functions and that she would be more knowledgeable than he about the issues related to any misapplied payments. As such, it is unlikely that Mr. Gagleard would have knowledge of the issues that Mrs. Gagleard did not possess.

If Mr. Gagleard did possess unique and useful testimony on the issue, Appellants were free to submit his testimony. As discussed earlier, Mr. Gagleard had multiple opportunities to submit his testimony at trial despite his medical challenges. Additionally, the limited testimony of Mr. Gagleard that is part of the record, namely portions of Mr. Gagleard's deposition testimony entered by Appellee, suggest that Mr. Gagleard would not provide more insight into the misapplied payments issue than Mrs. Gagleard would. As such, the Court finds that the bankruptcy court did not err in finding that no evidence exists to support Appellants' misapplied payments claims.

### C. Appellants' Preference of Other Creditors over the United States

The Appellants finally argue that the bankruptcy court erred when it found that Power PEO of Florida I and Way To Go PEO continued operating through at least 2007, and that when they became aware of these entities' tax liabilities in April of 2007, Appellants made payments to other creditors before the United States. Appellants argue that in May 2006, they sold their PEOs' clients to AMS, a company that provides staff leasing services. According to Mrs. Gagleard's testimony, they ceased operating their PEOs at this point. Additionally, Appellants argue that they were unaware of the payroll

tax liabilities until at least April 2007 due to their financial controller's embezzlement in the months or years prior. Appellants also reassert that Mr. Gagleard's testimony on this matter is important to understanding the larger picture, since Mrs. Gagleard is afflicted with poor memory and lack of first-hand knowledge.

This claim of error on appeal encompasses three distinct factual findings by the bankruptcy court. First, the bankruptcy court's finding on when the PEOs in question ceased operating. Second, the bankruptcy court's finding of when the Appellants knew that the unpaid tax liabilities existed. Third, and finally, the bankruptcy court's finding that Appellants made payments to creditors other than the United States after they became aware of their tax liabilities.

These issues are also reviewed for clear error as they involve the bankruptcy court's findings of fact. *In re JTS Corp.*, 617 F.3d at 1109. To reiterate, this Court must accept the bankruptcy court's findings of fact, unless the Court is left with the definite and firm conviction that a mistake has been committed. *Id.*

### 1.    When the PEOs Ceased Operating

The first fact issue on appeal is when the PEOs ceased operating. The issue is whether Appellants entered into an agreement with AMS. As the bankruptcy court recognized, if the Appellants sold the PEOs' clients to AMS in May of 2006, and did not become aware of the unpaid taxes in December 2006 or April of 2007, "the PEOs could not have been paying other creditors before the IRS because the PEOs no longer existed." (Order at 10).

Mrs. Gagleard testified at trial that in May of 2006, Appellants transferred their clients to a company named AMS in exchange for future payments from AMS. Appellants testified that one of the reasons they closed down their PEOs was that they could not obtain workers compensation insurance. As part of the deal, Appellants would continue to use the PEOs' software to process payroll through the Wells Fargo business bank account. Appellants claim that it was at this point in May of 2006 that their PEOs ceased operating.

Appellee disagrees, and supports the bankruptcy court's finding that "there [was] insufficient evidence for the [bankruptcy court] to conclude that the Debtors closed the PEOs in May 2006." (Order at 10). Appellee points to the flaws in the Marketing Group Agreement Appellants furnished to prove the execution of their transaction with AMS. Appellee notes that nothing in the agreement "relates to or even mentions a transfer of business." Appellee also points out that the document is undated, and only signed by "N.D. Gagleard" on behalf of Avio Alternatives, a non-party in the instant case. The document bears no signature on AMS' behalf. Appellee also notes that in addition to the flaws in the Marketing Group Agreement, the evidence at trial "made clear that after May 2006, and throughout at least 2007, Appellants continued operating the PEOs in the same manner as they had been." (Doc. 12 at 15). This was evidenced by Appellants working out of the same office, performing the same services for the same clients, and continuing to file annual registrations for Power PEO of Florida and Power PEO of Florida I until 2010. These facts, Appellee claims, support the assertion that these PEOs were in operation long after May of 2006.

This Court agrees with the bankruptcy court and Appellee on this issue. Appellants present little to support their assertion of the sale to AMS outside the testimony of Mrs. Gagleard. First, the Appellants furnished no documentary evidence to support the idea that the PEOs' worker's compensation insurance was canceled. Second, and perhaps most importantly, the Marketing Group Agreement which the bankruptcy court called "at best unpersuasive and at worst immaterial," did little to support Appellants' allegations. (Order at 11). Finally, there was ample evidence of similar and continuing business activity by the PEOs after May 2006, including bank records and annual registrations. In view of all these facts, this Court agrees with the bankruptcy court's decision in finding that there was insufficient evidence to conclude that the Appellants closed the PEOs in May 2006.

### 2. When Appellants Became Aware of Unpaid Taxes

Because this Court affirms the bankruptcy court's findings that Appellants were operating their PEOs past May of 2006, the next issue is when Appellants became aware of their PEO's unpaid taxes. The Ninth Circuit has stated that "[w]illfulness" under 26 U.S.C. § 6672 is the "voluntary, conscious and intentional act to prefer other creditors over the United States." *Phillips v. United States,* 73 F.3d 939, 942 (9th Cir. 1996). As such it is necessary to determine when, if ever, Appellants had knowledge of their unpaid taxes.

Appellants assert that they were unaware of the unpaid taxes attributable to Power PEO of Florida I and Way To Go PEO until at least April 15, 2007. This is the date on which Mr. Dietrich, Appellants' accountant designated to deal with the IRS, informed Appellants that the IRS could not find record of the tax deposits supposedly made by their controller, Ms. Atteberry. While IRS Officer Jensen paid Appellants a visit on December 16, 2006 to inform them of the missing tax payments, Ms. Atteberry quickly reassured Officer Jensen and the Appellants that all was in order. The Appellants do not dispute that the meeting with Officer Jensen occurred. Instead, they contend that they believed Ms. Atteberry, because what their books and records showed contradicted the statements of Officer Jensen. According to Appellants, it was not until April 15, 2007 that it was confirmed to them that the IRS had never received payments from the PEOs during the quarters in question.

Appellee simply asserts that Officer Jensen's visit in December 2006 made Appellants aware of their tax liabilities.

Ultimately, this Court agrees with the bankruptcy court that it is a "close call" whether Appellants actually became aware of the tax liabilities of their PEOs in December of 2006 or April of 2007. However, this Court may only overrule the bankruptcy court's finding of fact if it "is left with the definite and firm conviction that a mistake has been committed." *In re JTS Corp.*, 617 F.3d at 1109. It is believable that Ms. Atteberry, who later pled guilty to embezzlement, lied to Appellants in December

2006 about the status of their financials when Officer Jensen visited them. Taking that fact into account, coupled with Appellants' testimony that they were unaware of the actual liabilities they owed until their accountant told them in April of 2007, it is reasonable that Appellants truly were unaware of the PEOs' liabilities until then. As such, the Court affirms the bankruptcy court's conclusion that Appellants did not know until April 15, 2007 that payroll taxes were unpaid.

### 3. Payments to Other Creditors after Becoming Aware of Tax Liabilities

Since this Court has affirmed the bankruptcy court's findings that: (1) the PEOs in question operated after the alleged transaction with AMS in May 2006 and (2) that Appellants did not become aware of their true tax liabilities until April 15, 2007, it becomes relevant to determine whether Appellants paid other creditors besides the United States after April 2007. The bankruptcy court found that Appellants did pay other creditors before the United States.

Appellants do not directly address this issue in either their Opening Brief or their Reply Brief. Instead, Appellants state that the bankruptcy court's findings on this matter are "another example of the prejudice suffered by Appellants by not having Alan Gagleard available to testify." (Doc. 10 at 16). Appellants reassert that the failure of their motion to continue, and subsequently Mr. Gagleard's absence from the trial, prevented Mr. Gagleard's critical testimony from being given at trial.

Appellee argues that the PEOs did operate at least through the end of 2007, and during that time Appellants did pay other creditors to the exclusion of the United States. Appellee points to the over $69,000 in rent that Appellants paid to Double A Investments for the PEOs' office from February through December of 2007. Appellee also points to the over $19,000 that Appellants paid to Inter-Tel Leasing from January through August 2007 for telephone and data service. Finally, Appellee refers to the over $635,000 that Appellants paid from the PEOs' business account to American Express for business and personal credit card expenses from December 2006 through December 2007.

After viewing the facts supporting Appellee's contentions, including the admissions of Mrs. Gagleard, the Court finds that the bankruptcy court did not err when it determined that Appellants paid other creditors before the United States after becoming aware of their tax obligations in April 2007. As the bankruptcy court correctly points out, "[p]ayments to others ahead of the IRS, with the knowledge of an outstanding tax obligation is a willful violation of § 6672." (Order at 13 (citing *Phillips v. United States*, 73 F.3d 939, 942 (9th Cir. 1996))). Based on the foregoing facts, this Court affirms the bankruptcy court's determination that Appellants willfully failed to remit funds to the IRS.

## IV. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that the decision of the bankruptcy court is affirmed.

**IT IS FURTHER ORDERED** that pursuant to Federal Rule of Bankruptcy Procedure 8016(a), the Clerk of the Court shall enter judgment accordingly. This Court reads 28 U.S.C. § 158(d) as requiring only a judgment and not a mandate. However, if either party disagrees, such party must move for the issuance of a mandate within 14 days.

Dated this 25th day of October, 2017.

James A. Teilborg
Senior United States District Judge